UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No. |
| | ) |
| THE CITY OF NEW ORLEANS, LOUISIANA, | ) |
| | ) |
| Defendant, | ) |
| | ) |
| and | ) |
| | ) |
| THE LOUISIANA STATE | ) |
| BOND COMMISSION, | ) |
| | ) |
| Rule 19 Party. | ) |

**COMPLAINT**

The United States of America alleges:

<u>Jurisdiction</u>

1. This action is brought by the United States to enforce the Fair Housing Act, as amended ("the Fair Housing Act"), 42 U.S.C. §§ 3601 <u>et seq.</u>, and Title II of the Americans with Disabilities Act ("the ADA"), as amended, 42 U.S.C. §§ 12131, <u>et seq.</u>, and the regulations implementing Title II, 28 C.F.R. Part 35.

2. This Court has jurisdiction over this action under 28 U.S.C. §§ 1331 and 1345, 42 U.S.C. § 3614(a) and (b), and 42 U.S.C. § 12133. The Court may grant declaratory and other relief pursuant to 28 U.S.C. §§ 2201 and 2202.

3. Venue is proper under 28 U.S.C. § 1391(b), because the events giving rise to the claims alleged herein occurred in the Eastern District of Louisiana.

1

The Defendant

4. The City of New Orleans ("City") is a political subdivision of the State of Louisiana, located in Orleans Parish, within the Eastern District of Louisiana, and organized under the laws of the State of Louisiana. The City is a "public entity" within the meaning of the ADA, 42 U.S.C. § 12131(1), 28 C.F.R. § 35.104 and is therefore subject to Title II of the ADA, 42 U.S.C. §§ 12131, et seq., and its implementing regulations, 28 C.F.R. Part 35.

5. Pursuant to the authority granted it by the State of Louisiana, the City exercises zoning authority over land within its borders. The City's zoning regulations are set forth in an ordinance titled "New Orleans Comprehensive Zoning Ordinance" ("Zoning Ordinance"). Pursuant to the Zoning Ordinance, the New Orleans Board of Zoning Adjustments ("BZA") is the agency of the City responsible for, among other things, hearing and ruling on applications for variances from the provisions of the Zoning Ordinance

The Rule 19 Party

6. The Louisiana State Bond Commission ("Bond Commission") is an agency of the State of Louisiana, established by Article VII, Section 8 of the Louisiana Constitution of 1974, which provides that "No bonds or other obligations shall be issued or sold by the State directly or through any State board, agency or commission, or by any political subdivision of the State, unless prior written approval of the Commission is obtained."

The Complainants.

7. The Gulf Coast Housing Partnership ("GCHP") is a nonprofit real estate development company whose principal focus is providing affordable housing in southern Louisiana and Mississippi. Since 2009, GCHP has been trying to redevelop a building formerly

used as a nursing home, located at 2535 Esplanade Avenue in New Orleans ("the Esplanade property"), as an affordable apartment complex containing 40 units.

8. The 2535 Esplanade property is owned by GCHP-Esplanade LLC, a nonprofit corporation which is a wholly owned subsidiary of GCHP, formed for the purpose of taking title to the property. GCHP-Esplanade LLC and GCHP are collectively referred to hereinafter as "the Developers."

9 In planning the redevelopment of the Esplanade property, the Developers have worked in partnership with two other nonprofit organizations, the Common Ground Institute, a New York-based organization which has developed an innovative approach to providing supportive housing for the homeless, and Unity of Greater New Orleans, an umbrella organization of charities focused on the issue of homelessness in New Orleans. Half of the units in the proposed apartment building would be reserved for individuals whose annual incomes are substantially below the median annual income for the New Orleans area. The remaining units would be designated as "Permanent Supportive Housing," pursuant to Title IV of the McKinney-Vento Homeless Assistance Act of 1987, 42 U.S.C. § 11301 et seq. Such housing is only available to persons with disabilities who are formerly homeless.

10. The proposed use described in the preceding paragraph would include a case management office. Staff members of Unity of Greater New Orleans would use this office to assist tenants, at their request, in dealing with tasks involved in the transition from homelessness to independent living. The need for such assistance arises in many cases from the disabilities of the tenants.

11. The principal source of funding for the proposed redevelopment of the Esplanade

property would be provided under the "Piggyback Program," which was created by the State of Louisiana to assist in the redevelopment of areas devastated by Hurricane Katrina under this program, eligible projects will receive a combination of Community Development Block Grant ("CDBG") funds, commensurate tax-exempt bond authority, and 4% Low Income Housing Tax Credits (LIHTCs). Because state-issued bonds are an essential element of the financing for this project, the approval of the Bond Commission is required.

12. The Bond Commission's pattern or practice has been to refuse funding approval under the Piggyback Program for any project unless the local government where the project is located specifically requests the Commission for such approval.

The Developers' Zoning Applications

13. The 2535 Esplanade property is located in a district zoned RM-3 under the Zoning Ordinance. An apartment complex is a permitted use in this district. The Developers represented to the City, and City staff agreed, that the proposed use would be an apartment complex. However, an apartment complex is required by the Zoning Ordinance to provide one off-street parking space for each dwelling unit. As originally designed, the proposed apartment complex would have contained 42 dwelling units, whereas the existing parking lot on the property contained only 28 spaces. The Developers therefore applied to the BZA, in January of 2010, for a variance to permit the additional 14 parking spaces to be provided on the streets ("First Variance Application").

14. Pursuant to the Zoning Ordinance, notice of the application was provided to the residents of the surrounding neighborhood. Many neighbors expressed opposition to the proposed use of the property as affordable housing. Much of the opposition was expressly

premised on the perceived disabilities of the prospective residents of the supportive housing units. An unsigned flier circulated in the neighborhood, and submitted to the BZA, states that the units would be occupied by "the **homeless, ex-offenders**, people with **mental illness**, HIV/AIDS, people with a history of drug usage, and others similarly situated in a concept described as "Supportive housing.' . . . . NO facility of this nature should be located in a residential neighborhood, particularly an Historic Residential Neighborhood!!!!!" (Emphasis in original.) The president of the Esplanade Ridge & Treme Civic Association ("ERTCA"), submitted a letter opposing the variance to the BZA, on March 3, 2010, stating among other things that "These are people who really need more intensive care. In truth, they should be in an institutional setting."

15. The BZA held a hearing on the First Variance Application on March 8, 2010. A number of residents spoke at the hearing in opposition to the application, some of whom stated that they opposed the use of the Esplanade property as supportive housing on account of the perceived disabilities of the prospective residents of such housing. At the conclusion of the hearing, the BZA voted to deny the application. Members of the BZA admonished the Developers that they should make an effort to satisfy the concerns of neighborhood residents.

16. Following the denial of the First Variance Application, the Developers revised the plan for the Esplanade project. Under the new plan, the number of units would be reduced to 40, 20 of which would be supportive housing; a portion of the building would be demolished; and the parking lot would be reconfigured to provide 40 parking spaces. Under the new plan, therefore, the project would meet the parking requirement in the Zoning Ordinance.

17. However, the Zoning Ordinance requires a setback of at least ten feet between the use and Bell Street, the public right of way in back of the property. Under the revised plan, some of the parking spaces would be located less than ten feet from Bell Street. The Developers therefore applied to the BZA for a variance from the setback requirement ("Second Variance Application").

18. The BZA held a hearing on the Second Variance Application on May 10, 2010. At the beginning of the hearing, members of the Board asked representatives of the Developers whether they had met with neighborhood groups and whether the neighborhood groups were still opposed to the project. A number of neighborhood residents spoke at the hearing in opposition to the application, some of whom stated that they opposed the use of the Esplanade property as supportive housing on account of the perceived disabilities of the prospective residents of such housing. At the conclusion of the hearing, the BZA voted to deny the application.

19. Following the denial of the Second Variance Application, the Developers again revised the plan for the Esplanade project. The new plan continued to provide for 40 units, 20 of which would be supportive housing, and for demolition of a portion of the building. The new plan provided 43 parking spaces instead of 40. Some of these parking spaces would still be within the required setback from Bell Street. The Developers again applied to the BZA for a variance from the setback requirement ("Third Variance Application").

20. A number of neighborhood residents spoke at the November 8, 2010 hearing in opposition to the application, some of whom again stated that they opposed the use of the Esplanade property as supportive housing on account of the perceived disabilities of the prospective residents of such housing. At the conclusion of the hearing, three BZA

members voted in favor of a motion to deny the application, and three members voted in opposition to the motion. The application was thus denied without prejudice by an equally divided vote.

### The City's Determination that Permanent Supportive Housing is Not a Permitted Use at 2535 Esplanade

21. On November 8, 2010, the ERTCA, through its attorney, filed a "Motion to Dismiss For Lack of Jurisdiction and Opposition to Application For a Variance" with the BZA. In this document, the ERTCA argued that the proposed use had been improperly classified as an apartment complex and should be considered instead to be a "Residential Care Center," which is not a permitted use in an RM-3 district. Counsel for the ERTCA made an oral presentation in support of this argument before the BZA at its November 8, 2010 hearing. The BZA determined that it did not have jurisdiction to consider this argument.

22. On January 24, 2011, Yolanda W. Rodriguez, Executive Director of the City Planning commission, sent an interoffice memo to Paul A. May, Director of the City's Department of Safety and Permits, stating in relevant part that the Third Variance Application

> was previously heard by the Board of Zoning Adjustments on November 8, 2010 . . . . The request was denied at that time due to the lack of majority decision. However, at that meeting, area residents gave public testimony that they had spoken to you and that you had indicated to them that you had never issued an opinion as to the zoning classification of the proposed use. Thus, we are forwarding this new application to you so that you can provide the BZA with your written interpretation of the classification of the proposed use.

23. On April 8, 2011, Mr. May sent Ms. Rodriguez a letter ("May letter"), which states in relevant part:

> It is the determination of the Department of Safety and Permits that the

>  use as represented is not permitted because it does not comply with the Zoning Ordinance. The proposed development includes an on site office for a case manager to provide certain supportive services to the tenants. This proposed accessory use is not specifically listed as a permitted accessory use in the RM-2 [sic] District.

> The "on-site office" referred to in this letter is the office described in paragraph 10 above. This letter did not specify how the proposed use, previously treated by the City as a multifamily dwelling, a permissible zoned use for that parcel of land, should be classified. Its effect was to prevent the Developers from proceeding further with the conversion of 2535 Esplanade to permanent supportive housing.

24. At the time it was issued, the May letter constituted the City's official position with respect to the Zoning Ordinance. While it was in effect, this letter prevented the project from going forward.

25. As provided for by the City's ordinances, the Developers appealed the May letter described in paragraph 22 to the BZA. At its regularly scheduled meeting on November 16, 2011 and more than 7 months after its issuance, the BZA granted the appeal and rescinded the May letter.

26. At its regularly scheduled meeting on December 12, 2011, the BZA, on its own motion and with three stated conditions, granted the Developers a variance permitting the property to be redeveloped as low-income housing without off-street parking in addition to that already present on the site.

<u>The City's discriminatory refusal to ask the Bond Commission to authorize funding of the Esplanade project.</u>

27. The City is aware that the Bond Commission will not approve the Piggyback funding for the Esplanade project, as described in Paragraphs 11 - 12, unless the City asks it to do so. The City has asked the Bond Commission to approve funding for other projects, and the Bond Commission has complied with those requests by the City. However, the City has not asked and refuses to ask the Bond Commission to approve the funding for the Esplanade project.

28. By the actions of its agents and employees described in paragraphs 13-27, City forced the Developers to incur substantial monetary damages.

29. The proposed apartment units at the Esplanade project would be dwellings within the meaning of 42 U.S.C. § 3602(b).

## COUNT ONE - Violation of the Fair Housing Act

30. The allegations in paragraphs 1-29, above, are incorporated herein by reference.

31. The Defendant denied the First and Second Variance Applications because of the disabilities of the prospective residents of the Esplanade project, thereby making unavailable or denying dwellings to renters or prospective renters because of their disability, in violation of 42 U.S.C. § 3604(f)(1);

32. In the Defendant's ruling, through its agent Paul A. May, that the use of the Esplanade property as Permanent Supportive Housing was not permitted in an RM-3 district, the

Defendant acted to prevent persons with disabilities from occupying the property as dwellings.

33. In refusing to ask the Bond Commmission to approve funding for the Esplanade project, the Defendant acted to prevent persons with disabilities from occupying the property as dwellings.

34. The Defendant's discriminatory actions were intentional, willful, and taken in disregard for the fair housing rights of others.

35. The Defendant's conduct described above constitutes:

   a. a denial of rights to a group of persons granted by the Fair Housing Act that raises an issue of general public importance under 42 U.S.C. § 3614(a); and

   b. a discriminatory housing practice under 42 U.S.C. § 3614(b)(1).

36. The Developers, and other persons who may have been the victims of the Defendant's discriminatory housing practices, are aggrieved persons as defined in 42 U.S.C. § 3602(i), and have suffered damages as a result of the Defendant's conduct.

37. Because the Bond Commission controls the funding required for the Esplanade project to go forward, it is a party in whose absence the Court cannot accord complete relief in this action. The Bond Commission is subject to service of process in this Court, and its joinder will not deprive this Court of jurisdiction. The Bond Commission must therefore be joined as a party pursuant to Fed. R. Civ. P. 19(a)(1)(A).

### COUNT TWO - Violation of the Americans with Disabilities Act

38. The allegations in paragraphs 1-29, above, are incorporated herein by reference.

39. The United States Department of Justice is the federal agency responsible for administering and enforcing Title II of the ADA, 42 U.S.C. §§ 12131 et seq.

40. The Defendant, through the actions described above, has excluded individuals with disabilities from participation in and denied them the benefits of the services, programs, or activities of a public entity, in violation of 42 U.S.C. § 12132 and 28 C.F.R. § 35.130.

41. The Defendant's discriminatory actions were intentional, willful, and taken in disregard for the rights of others.

WHEREFORE, the United States prays that the Court enter an ORDER that:

1. Declares that the Defendant's actions described above constitute violations of the Fair Housing Act, as amended, 42 U.S.C. §§ 3601 et seq., and Title II of the Americans with Disabilities Act, 42 U.S.C. §§ 12131 et seq.

2. Enjoins the Defendant, its agents, employees, assigns, successors, and all other persons in active concert or participation with them, from discriminating on the basis of disability in violation of the Fair Housing Act, as amended, 42 U.S.C. §§ 3601 et seq., and Title II of the Americans with Disabilities Act, 42 U.S.C. §§ 12131 et seq. and its accompanying regulations;

3. Enjoins the Defendant, its agents, employees, assigns, successors, and all other persons in active concert or participation with them further:

    a. Excluding individuals with disabilities from participation in and denied them the benefits of the services, programs, or activities of a public entity;

    b. Failing to make a reasonable modification in its policies, practices, or procedures, which would result in the Defendant excluding individuals with disabilities from participating in and or denying them the benefits of the services, programs, or activities of the City;

    c. Failing or refusing to take such affirmative steps as may be necessary to

       prevent the recurrence of any discriminatory conduct in the future and to eliminate, to the extent practicable, the effects of the Defendant's unlawful practices; and

       d.     Awards monetary damages in an appropriate amount to fully compensate each person aggrieved by the Defendant's discriminatory housing practices for its injuries caused by the Defendant's failure to comply with the requirements of the Fair Housing Act and ADA; and

4.     Assesses a civil penalty against the Defendant in an amount authorized by 42 U.S.C. § 3614(d)(1)(C) to vindicate the public interest.

The United States further prays for such additional relief as the interests of justice may require.

                                    ERIC H. HOLDER JR.
                                    Attorney General

| | |
|---|---|
| JIM LETTEN | THOMAS E. PEREZ |
| United States Attorney | Assistant Attorney General |
| Eastern District of Louisiana | Civil Rights Division |
| | |
| | STEVEN H. ROSENBAUM |
| | Chief, Housing and Civil Enforcement Section |
| | |
| |   /s/ Harvey L. Handley |
| GLENN SCHRIEBER | REBECCA B. BOND |
| Assistant United States Attorney | Deputy Chief |
| 500 Poydras Street, Suite B-210 | HARVEY L. HANDLEY |
| New Orleans, Louisiana 70130 | Attorney |
| | U.S. Department of Justice |
| | Civil Rights Division |
| | Housing and Civil Enforcement Section |
| | 950 Pennsylvania Avenue |
| | The Northwestern Building |
| | Washington, D.C. 20530 |
| | Tel.: (202) 514-4756 |
| | Facsimile: (202) 514-1116 |