UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA


UNITED STATES OF AMERICA                CIVIL ACTION

VERSUS                                  NO. 12-2011

THE CITY OF NEW ORLEANS and             SECTION: "F"
THE LOUISIANA STATE BOND COMMISSION


ORDER AND REASONS

Before the Court is the City of New Orleans motion to dismiss the government's complaint for lack of subject matter jurisdiction under Federal Rule 12(b)(1), and for failure to state a claim upon which relief can be granted under Rule 12(b)(6).  For the reasons that follow, the motion is DENIED.


Background

This case arises out of the proposed redevelopment of a former nursing home into an affordable apartment complex.

Beginning in 2009, the Gulf Coast Housing Partnership ("GCHP"), a nonprofit real estate development company whose principal focus is providing affordable housing, began redeveloping a building formerly used as a nursing home, located at 2535 Esplanade Avenue in New Orleans.  GCHP, along with other nonprofit organizations and developers, planned to convert the Esplanade property into a forty-unit affordable housing

1

development.  Half of the proposed units would be reserved for low-income individuals, and the other half of the units would serve as "permanent supportive housing" for homeless persons with mental and physical disabilities.  The Esplanade property would also include an on-site case management office, which would primarily involve assisting tenants in the transition from homelessness to independent living.

The main source of funding for the redevelopment project was to be provided by the Piggyback Program, which was created by the State of Louisiana to assist in redevelopment efforts post-Hurricane Katrina.  Through the Piggyback Program, eligible projects would receive funds from a combination of sources, including state-issued bonds that require the approval of the Bond Commission.  In August 2009, the Bond Commission adopted a moratorium on approving bond financing under the Piggyback Program for low-income housing projects, stating that it needed to study the housing marking in New Orleans.  A final study was released in March 2011, which concluded that the New Orleans' housing market would support additional low-income affordable housing; however, the moratorium has yet to be lifted.

To date, the Esplanade project has not received Piggyback funding.[1]  The project has had a difficult history.

---

[1]  In its first amended complaint, the United States alleges that the City engaged in actions to prevent the funding of Esplanade.  Specifically, the United States asserts that the City

According to the local zoning ordinance, the Esplanade property is located in a RM-3 zoned district that allows for apartment complex use; however, the ordinance also requires that an apartment complex provide off-street parking for each dwelling unit.  The original proposed apartment complex for the Esplanade property included forty-two dwelling units, but the existing parking lot only contained twenty-eight spaces.  As a result, in January 2010, the developers applied to the Board of Zoning Adjustments for a variance to waive the additional fourteen off-street parking spots, and to allow the fourteen parking spaces to be located on the streets.  Pursuant to the zoning ordinance, notice of the developers' application was provided to residents of the surrounding neighborhood.  On March 8, 2010, the Board

---

is aware that it must request funding approval from the Bond Commission, but the City refuses to do so because of the prospective Esplanade tenants.  The United States points to two other low-income housing projects, neither of which provide housing for persons with disabilities, as support for its argument.

On August 4, 2010, the Mayor wrote to the Chairman of the Bond Commission to request that a seventy-unit affordable housing project known as the Oretha Castle Haley development be placed on the August 2010 Bond Commission agenda and approved.  The Bond Commission subsequently placed this project on its August 2010 agenda and approved its financing.  Similarly, on August 17, 2011, the Mayor wrote to the Chairman in support of bond financing of the B.W. Cooper mixed-income housing development. The Bond Commission placed the B.W. Cooper project on the August 2011 agenda and approved its financing.

Moreover, the complaint asserts that the Esplanade project developers have repeatedly requested that the Mayor seek bond financing approval from the Bond Commission, and on each occasion the Mayor refused these requests and provided no explanation.

held a hearing on the first variance application, and neighbors vocalized opposition, the extent to which is disputed, to the proposed use of the property.[2]

At the end of that hearing, the Board denied the first variance application.  The developers subsequently revised the plan for the Esplanade property.  The number of units, it was proposed, would be reduced to forty, twenty of which would be supportive housing.  A portion of the building would be demolished, and the parking lot would be reconfigured to provide the required forty parking spaces.  Under the revised plan, however, some of the parking spaces would be located less than ten feet from Bell Street, the public right of way behind the property, in violation of the zoning ordinance.  And so, the developers submitted still a second variance application to the Board, requesting a waiver of the setback requirement. On May 10,

---

[2] In its amended complaint, the United States emphasizes the amount of opposition expressed by the neighbors.  Specifically, the United States quotes an unsigned flier that was allegedly circulated in the neighborhood and submitted to the Board. According to the complaint, the flier states that the proposed Esplanade apartments would be occupied by "the **homeless**, **ex-offenders**, people with **mental illness**, HIV/AIDS, people with a history of drug usage, and others similarly situated in a concept described as "supportive housing." . . . NO facility of this nature should be located in a residential neighborhood, particularly an Historic Residential Neighborhood!!!!!" (emphasis in original).  The United States's complaint also cites a letter opposing the variance, written by the president of the Esplanade Ridge & Treme Civic Organization, which states that "[t]hese are people who really need more intensive care.  In truth, they should be in an institutional setting."

4

2010, the Board conducted a hearing on the second variance application, and voted to deny the application.[3]

After the denial of the second variance application, the developers again revised the plan for the Esplanade property. The plan would still provide for forty dwelling units, twenty of which would be for supportive housing, and a portion of the building would be demolished. The number of parking spaces were increased to forty-three, but some of those spaces would still be located within the required setback from Bell Street. The developers submitted a third variance application, again, asking for a waiver of the setback requirement.

On November 8, 2010, after a hearing on the third variance application, the application was denied without prejudice by an equally divided vote of the Board members. On the same day, November 8, an attorney for the Esplanade Ridge & Treme Civic Association ("ERTCA") filed a motion to dismiss the developers' variance application, alleging that the proposed use of the Esplanade property had been improperly classified as an apartment complex. ERTCA asserted that the Esplanade property should be considered a residential care center, which is not permitted in a RM-3 zoned district. The Board decided that it lacked jurisdiction to consider the argument. And the difficulties

---

[3] Again, the government's complaint alleges that numerous neighborhood residents spoke out at the hearing in opposition to the application.

continued.

Paul A. May, Director of the City's Department of Safety and Permits, sent a letter to the City Planning Commission dated April 8, 2011, which stated that the proposed use of the Esplanade property did not comply with the zoning ordinance, because the proposed use involved a supportive service to the tenants (the on-site office that assisted the homeless transition into independent living), which he stated is not an allowed use for a RM-3 zoned district.  The developers appealed the Paul May letter to the Board.

On November 16, 2011, approximately seven months after the letter was issued, the Board granted the appeal and rescinded the Paul May letter.  On December 12, 2011, the Board, on its own motion, finally granted to the developers a variance permitting the Esplanade property to be redeveloped as low-income housing, with an on-site case management office, and without additional off-street parking spaces.

The United States Department of Justice filed suit in this Court on August 6, 2012, alleging that the City of New Orleans and the Louisiana Bond Commission violated the Fair Housing Act and Title II of the American with Disabilities Act.  The United States seeks injunctive relief to stop the City from continuing to obstruct the Esplanade project, and retrospective relief for the damages incurred by the developers due to the City's delays.

The City now moves for dismissal under Federal Rules 12(b)(1) and 12(b)(6), asserting that the Court lacks subject matter jurisdiction, and that the United States has failed to state a claim upon which relief can be granted.

I. <u>Legal Standards</u>

*A.*

Motions filed under Rule 12(b)(1) of the Federal Rules of Civil Procedure allow a party to challenge the Court's subject matter jurisdiction. Fed. R. Civ. P. 12(b)(1). The burden of proof for a Rule 12(b)(1) motion to dismiss is on the party asserting jurisdiction. <u>Ramming v. United States</u>, 281 F.3d 158, 161 (5th Cir. 2001). The Court may find a plausible set of facts to support subject matter jurisdiction by considering any of the following: "(1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." <u>Barrera-Montenegro v. United States</u>, 74 F.3d 657, 659 (5th Cir. 1996).

*B.*

The City's second ground for dismissal advanced here is dismissal for failure to state a claim under Rule 12(b)(6). The standard of review applicable to motions to dismiss under Rule 12(b)(6) is similar to that applicable to motions to dismiss under Rule 12(b)(1). <u>See Williams v. Wynne</u>, 533 F.3d 360, 364-65

7

n.2 (5th Cir. 2008)(observing that the Rule 12(b)(1) and Rule 12(b)(6) standards are similar, but noting that applying the Rule 12(b)(1) standard permits the Court to consider a broader range of materials in resolving the motion).

Rule 12(b)(6) of the Federal Rules of Civil Procedure allows a party to move for dismissal of a complaint for failure to state a claim upon which relief can be granted.  Such a motion is rarely granted because it is viewed with disfavor.  See Lowrey v. Tex. A & M Univ. Sys., 117 F.3d 242, 247 (5th Cir. 1997) (quoting Kaiser Aluminum & Chem. Sales, Inc. v. Avondale Shipyards, Inc., 677 F.2d 1045, 1050 (5th Cir. 1982)).  In considering a Rule 12(b)(6) motion, the Court "accepts 'all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff.'"  See Martin K. Eby Constr. Co. v. Dall. Area Rapid Transit, 369 F.3d 464 (5th Cir. 2004) (quoting Jones v. Greninger, 188 F.3d 322, 324 (5th Cir. 1999)).  But, in deciding whether dismissal is warranted, the Court will not accept conclusory allegations in the complaint as true.  Kaiser, 677 F.2d at 1050. Indeed, the Court must first identify allegations that are conclusory and, thus, not entitled to the assumption of truth.  Ashcroft v. Iqbal, 556 U.S. 662, 678-79 (2009).  A corollary: legal conclusions "must be supported by factual allegations." Id. at 678.  Assuming the veracity of the well-pleaded factual allegations, the Court must then determine

"whether they plausibly give rise to an entitlement to relief." Id. at 679.

"'To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" Gonzalez v. Kay, 577 F.3d 600, 603 (5th Cir. 2009)(quoting Iqbal, 556 U.S. at 678)(internal quotation marks omitted). "Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (citations and footnote omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678 ("The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."). This is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Id. at 679. "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." Id. at 678 (internal quotations omitted) (citing Twombly, 550 U.S. at 557). "[A] plaintiff's obligation to provide the 'grounds' of his

9

'entitle[ment] to relief'", thus, "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." <u>Twombly</u>, 550 U.S. at 555 (alteration in original) (citation omitted).

In deciding a motion to dismiss, the Court may consider documents that are essentially "part of the pleadings."  That is, any documents attached to or incorporated in the plaintiff's complaint that are central to the plaintiff's claim for relief. <u>Causey v. Sewell Cadillac-Chevrolet, Inc.</u>, 394 F.3d 285, 288 (5th Cir. 2004) (citing <u>Collins v. Morgan Stanley Dean Witter</u>, 224 F.3d 496, 498-99 (5th Cir. 2000)).  Also, the Court is permitted to consider matters of public record and other matters subject to judicial notice without converting a motion to dismiss into one for summary judgment.  <u>See United States ex rel. Willard v. Humana Health Plan of Tex. Inc.</u>,  336 F.3d 375, 379 (5th Cir. 2003).

## II.   <u>Discussion</u>

The City of New Orleans contends that the United States's complaint should be dismissed for lack of subject matter jurisdiction and for failure to state a claim upon which relief can be granted.  The Court disagrees.

### *A.*

The City first asserts that the Court lacks subject matter

jurisdiction because the Board ultimately approved the developers' requested variances, which therefore render the issues here moot and not ripe for judicial review.  Although the City refers to "mootness" and "ripeness" interchangeably throughout its papers, it is important to note that they demand distinct inquiries, and neither doctrine deprives the Court of subject matter jurisdiction here.

"A court should dismiss a case for lack of ripeness when the case is abstract or hypothetical.  The key considerations are 'the fitness of the issues for judicial decision and the hardship to the parties of withholding court considerations.'" Groome Res. Ltd., L.L.C. v. Parish of Jefferson, 234 F.3d 192, 199 (5th Cir. 2000) (quoting New Orleans Pub. Serv., Inc. v. Council of New Orleans, 833 F.2d 583, 586-87 (5th Cir. 1987)).  Under the first prong of the ripeness inquiry, which examines the fitness of the issues, the Fifth Circuit has expressly stated that "under the Fair Housing Act . . . a violation occurs when the disabled resident is first denied a reasonable accommodation, irrespective of the remedies granted in subsequent proceedings." Id. (quoting Bryant Woods Inn, Inc. v. Howard Cnty., 124 F.3d 597, 602 (4th Cir. 1997))(internal quotation marks omitted).  Moreover, the Fifth Circuit has elaborated that a "denial can be both actual or constructive, as an indeterminate delay has the same effect as an outright denial." Id.

11

The Court finds here that the issues seem fit for judicial review.  Beginning with the first denial of the developers' variance application in March 2010, the developers encountered a series of moves that resulted in a considerable delay of nearly twenty-one months, until December 2011 when the Board finally granted the variances.  Included within this twenty-one month time lapse is the seven-month period during which the developers had to wait while they appealed the Paul May letter, which completely obstructed and trumped the ability of the developers to proceed with the Esplanade project; the letter opined that the planned property use included a supportive service to the tenants that was not allowed in a RM-3 zoned district.  Moreover, the fact that the Board eventually approved the variance requests is not dispositive here, because, as mentioned, the Fifth Circuit has unqualifiedly held that denial (which can be actual or constructive) is a violation under the FHA "irrespective of the remedies granted in subsequent proceedings." Id. (affirming the district court's finding that the plaintiff's suit, which challenged a ninety-five day delay on a zoning ordinance application, was ripe under the FHA); see also Bryant Woods, 124 F.3d at 602 (holding that the case was ripe because a FHA violation occurs once the disabled resident is denied a reasonable accommodation notwithstanding subsequent remedies); Meadows of W. Memphis v. City of W. Memphis, 800 F.2d 212, 215

12

(8th Cir. 1986) ("[W]e have no doubt that the case is ripe for
adjudication.  The complaint alleges [under the FHA] that the
City . . . has blocked the plaintiff's access to public financing
for at least a year. . . . The injury is real, definite, and
complete. . . . [E]ven if only a one-year postponement occurs,
and the project is ultimately built, a real economic loss has
still occurred, or at least the complaint so alleges.").  These
precedents bind this Court.

     The City adds for emphasis that the United States's claim
that the City has taken action to prevent funding is merely
abstract or hypothetical because the City has no control over the
required funding.  However, the United States asserts that as a
matter of practice, the Bond Commission will not approve
financing unless and until the City requests that it do so, and
that the Esplanade developers have repeatedly asked the City for
help in securing bond financing, but all to no avail.  Based on
the amended complaint, which provides specific examples in which
the City requested that the Bond Commission grant funding for
low-income housing projects (that notably do not target persons
with disabilities), and the Bond Commission approvals of funding,
the Court finds that the complaint establishes a plausible set of
facts that is not so abstract or hypothetical to warrant
dismissal for lack of subject matter jurisdiction.

     Under the second prong of the ripeness inquiry, which

assesses the "hardship to the parties of withholding court
consideration," the Fifth Circuit has held that "housing
discrimination causes a uniquely immediate injury." Groome, 234
F.3d at 200 (internal quotation marks omitted); see also Assisted
Living Assocs. of Moorestown, L.L.C. v. Moorestown Twp., 996 F.
Supp. 409, 427-28 (D.N.J. 1998) (collecting cases that discuss
the injuries that make FHA discrimination issues ripe).
Moreover, the Fifth Circuit has noted that in addition to the
injury that may result from housing discrimination, there is also
"concrete economic hardship from continued delay." Groome, 234
F.3d at 200.  Here, the developers may well have incurred
specific economic damages from the delay in commencing operations
and the foregone use of the property (and having to revise the
Esplanade proposal several times).  The Court finds these claims
of hardships can conceptually frustrate the purpose of the FHA
and the ADA, and thus the issue is ripe for review.[4]

*B.*

The City also contends that this case is moot because the
Board has since granted the developers' variance requests.

In general, a claim becomes moot "when the issues presented
are no longer 'live' or the parties lack a legally cognizable
interest in the outcome." La. Envtl. Action Network v. U.S.

---

[4] The Court expresses no opinion about the merits of the claims
alleged.

Envtl Prot. Agency, 382 F.3d 575, 581 (5th Cir. 2004) (quoting Murphy v. Hunt, 455 U.S. 478, 381 (1982) (per curium)).  The United States's case cannot be mooted simply because the Board changed its position on the developers' variances.  See Buckhannon Bd. and Care Home, Inc. v. W. Va. Dept. of Health & Human Res., 532 U.S. 598, 608-09 (2001) (noting that although the defendant enacted legislation that would eliminate the FHA violation, "so long as the plaintiff has a cause of action for damages, a defendant's change in conduct will not moot the case").  Moreover, the U.S. Supreme Court has counseled:

> Irrespective of the issue of injunctive relief, [the plaintiff] continue[s] to seek damages to redress alleged violations of the Fair Housing Act. . . . Given [plaintiff's] continued active pursuit of monetary relief, this case remains definite and concrete, touching the legal relations of parties having adverse legal interests.

Havens Realty Corp. v. Coleman, 455 U.S. 363, 371 (1982) (internal quotation marks omitted).  The United States requests monetary relief here for the costs it had to incur while the City allegedly delayed the Esplanade project; the case has not been mooted.  See Knox v. Serv. Emps. Int'l Union, Local 1000, 132 S. Ct. 2277, 2287 (2012) ("As long as the parties have a concrete interest, however small, in the outcome of the litigation, the case is not moot.").

Mootness doctrine is also sensitive to requests, such as in

this case, regarding injunctive relief:

> It is well settled that a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice. . . . . If it did, the courts would be compelled to leave the defendant . . . free to return to his old ways.

Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 189 (2000) (citations and internal quotation marks omitted).  Therefore, in determining whether the United States's request for injunctive relief is moot, the defendant has the "heavy burden of persuading the court" that it is "absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur."  Id. (quoting United States v. Concentrated Phosphate Export Ass'n, 393 U.S. 199, 203 (1968)).

The City fails to meet that burden here.  In its submissions in support of dismissal, the City repeatedly emphasizes that the Board approved the developers' requested variances, and, in a conclusory fashion, alleges that the claims are moot.  In what is best characterized as an attempt to show that the alleged wrongful behavior will not be repeated, the City submits that it is currently defending the Board's decision to grant the developers' variances in three state court lawsuits.  In those suits, the City has asserted that it has obligations under the FHA and ADA, which is why the City permitted the variances.  The fact that the City is defending itself in lawsuits does nothing

16

to persuade this Court, as reasonable as the argument seems, that the allegedly wrongful conduct could not reasonably recur, given that the Esplanade project has yet to receive approved funding.

*C.*

The City also seeks the benefit of Rule 12(b)(6); it urges that the United States has failed to state a claim for any violation under the FHA or ADA because the Board has granted the developer's requested variances, and the City has no control over the Bond Commission's funding.  The submission also lacks merit in motion practice.  The City's reliance on the fact that the Board eventually granted the variances is misplaced.  A violation under the FHA and ADA occurs when the denial is first made, "irrespective of the remedies granted in subsequent proceedings." Groome, 234 F.3d at 199.  Moreover, the fact that the City does not expressly control the Commission's funding does not defeat the allegation that the City has prevented the funding of the project.  See Twombly, 550 U.S. at 555 ("Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)."); see also Meadows of W. Memphis, 800 F.2d at 215 (noting that the court must accept the allegations as true when the complaint alleged that the City blocked plaintiff's access to public financing for an impermissible reason); Bennett v. Slidell, 728 F.2d 762,  (5th

17

Cir. 1984).  Therefore, keeping in mind that the Court must accept all well-pleaded facts as true and in a light most favorable to the plaintiff, the Court finds that United States's complaint sufficiently states claims under the FHA and the ADA to survive dismissal under Rule 12(b)(6).  The federal statutes are far-ranging.

> Under the Fair Housing Act, it is unlawful
>
> [t]o discriminate in the sale or rental, or to otherwise make unavailable or deny, a dwelling to any buyer or renter because of a handicap of . . . a person residing in or intending to reside in that dwelling after it is . . . made available . . . or any person associated with that buyer or renter.

42 U.S.C. § 3604(f)(1).  Similarly, Title II of the ADA generously mandates that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subject to discrimination by such entity."  42 U.S.C. § 12132.  Both federal statutes apply to municipal zoning decisions.  See Greater New Orleans Fair Hous. Action Ctr. v. St. Bernard Parish, 648 F. Supp. 2d 805, 808 (E.D. La. 2009); see also Tsombanidis v. W. Haven Fire Dept., 352 F.3d 565, 573-74 (2d Cir. 2003); Oconomowoc Residential Programs v. City of Milwaukee, 300 F.3d 782-83 (7th Cir. 2002).  The United States's complaint pleads sufficient facts, and the City does not contest, that the prospective tenants of the Esplanade project are "disabled" within the terms

of both statutes, because addiction and mental illness are considered disabilities under the law.  See, e.g., 24 C.F.R. § 100.201(a)(2) (noting that "handicap" under the FHA includes emotional or mental illness, along with drug addition other than addiction caused by current, illegal use of a controlled substance); 28 C.F.R. § 41.31(b)(1)(ii) (same regulation under the ADA).

Further, the United States alleges claims of intentional discrimination under the FHA and ADA.[5]  To prove disparate treatment under both statutes, one must show that the defendant intended to discriminate or was improperly motivated in making the discriminating decision.[6]  See, e.g., Hanson v. Veterans Admin., 800 F.2d 1381, 1386 (5th Cir. 1986); Greater New Orleans Fair Hous. Action Ctr., 648 F. Supp. at 808.  Fair Housing Act cases have adopted the same standard for proving discriminatory intent that governs an equal protection claim as articulated by the Supreme Court in Village of Arlington Heights v. Metropolitan

_____

[5] The statutes are often interpreted in tandem.  Again, the Court expresses no opinion on the merits of this case.

[6] With the exception of the Age Discrimination in Employment Act (ADEA), the mixed-motive framework is still available for claims under antidiscrimination statutes within the Fifth Circuit.  See, e.g., Smith v. Xerox Corp., 602 F.3d 320 (5th Cir. 2010) (limiting the application of Gross v. FBL Fin. Servs., Inc. to claims under the ADEA only).

Housing Development Corp., 429 U.S. 252 (1977).[7]  To assess
whether or not discriminatory intent exists, the Fifth Circuit,
faithful to Arlington Heights, has held the following
circumstantial factors to be both pertinent and non-exhaustive:

> (1)  historical background of the decision;
>
> (2)  the specific sequence of events leading up to the
>      decision;
>
> (3)  departures from the normal procedural sequence;
>
> (4)  substantive departures; and
>
> (5)  legislative history, especially where there are
>      contemporary statements by members of the decision-
>      making body.

Overton v. City of Austin, 871 F.2d 529, 540; see also Greater
New Orleans Fair Hous. Action Ctr., 648 F. Supp. 2d at 808
(applying the Arlington Heights factors to find that the Parish
discriminated in violation of the FHA).

Application of the Arlington Heights factors here
demonstrates that the discrimination claims of the federal
government are plausible on their face.[8]  Under the first and

---

[7] For FHA cases adopting the Arlington Heights standards, see
United States v. Yonkers Bd. of Educ., 837 F.2d 1181, 1216-17 (2d
Cir. 1987); United States v. City of Birmingham, Mich., 727 F.2d
560, 565 (6th Cir. 1984); Greater New Orleans Fair Hous. Action
Ctr. v. St. Bernard Parish, 648 F. Supp. 2d 805, 809-19 (E.D. La.
2009); Greater New Orleans Fair Hous. Action Ctr. v. St. Bernard
Parish, 641 F. Supp. 2d 563, 568-77 (E.D. La. 2009); Atkins v.
Robinson, 545 F. Supp. 852, 870-71 (E.D. Va. 1982), aff'd, 733
F.2d 318 (4th Cir. 1984); In re Malone, 592 F. Supp. 1135, 1166
(E.D. Mo. 1984), aff'd, 794 F.2d 680 (8th Cir. 1986).

[8]  The United States need not plead a prima facie case to state a
plausible claim of discrimination.  See Flores v. Select Energy

second <u>Arlington Heights</u> factors, the United States alleges that the Board denied the developers' variance applications on three different occasions, in large part because of the community opposition expressed at the hearings.  The City contends that the public's statements are irrelevant; however, several courts have held that a city may be liable for responding to public opposition.  <u>See</u> <u>Greater New Orleans Fair Hous. Action Ctr.</u>, 648 F. Supp. at 811-12 ("[T]he public statements are relevant both as expressing the general sentiment during the decision making process and also insofar as public opinion was specifically referenced by the decision-makers themselves."); <u>see</u> <u>also</u> <u>Tsombanidis</u>, 352 F.3d at 580 ("[T]he history of hostility of neighborhood residents . . . and their pressure on the Mayor and other city officials . . . supports the [district] court's finding that this hostility motivated the City in initiating and continuing its enforcement efforts."); <u>Caron Found. of Fla., Inc. v. City of Delray Beach</u>, No. 12-80215, 2012 WL 2249263, at *10 (noting that the sequence of events suggests improper discriminatory motive when the City denied a reasonable accommodation request in light of "vocal community and planning board opposition").  These decisions recognize the reality of such controversial proposals in the urban setting.

---

<u>Servs., L.L.C.</u>, No. 11-11024, 2012 WL 3530911, at *2 (5th Cir. Aug. 16, 2012) (citing <u>Swierkiewicz v. Sorema N.A.</u>, 534 U.S. 506, 510 (2002)).

Moreover, regarding the third and fourth Arlington Heights factors, the United States specifically alleges in its amended complaint that the Board acted against its own recommendation and provided no explanation for any of its three variance denials. Finally, with respect to the fifth Arlington Heights factor, the complaint alleges that the Board members have made statements that demonstrated that they were aware of the community opposition, and, as mentioned above, references by decision-makers to public sentiment can be instructive in a discriminatory intent analysis. See Greater New Orleans Fair Hous. Action Ctr., 648 F. Supp. at 811-12. In sum, the United States's complaint contains sufficient factual matter, on the present record, which accepted as true, states a claim to relief that is plausible on its face.

Accordingly, IT IS HEREBY ORDERED that the motion to dismiss by the City of New Orleans is DENIED.

New Orleans, Louisiana, December 6, 2012

MARTIN L. C. FELDMAN
UNITED STATES DISTRICT JUDGE