UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

UNITED STATES OF AMERICA                    CIVIL ACTION

VERSUS                                      NO. 12-2011

THE CITY OF NEW ORLEANS and                 SECTION: "F"
THE LOUISIANA STATE BOND COMMISSION

ORDER AND REASONS

Before the Court is the Louisiana State Bond Commission's Rule 12(b)(6) motion to dismiss for failure to state a claim upon which relief can be granted.  For the reasons that follow, the motion is DENIED.

Background

This case arises out of the proposed redevelopment of a former nursing home into an affordable housing apartment complex.

Beginning in 2009, the Gulf Coast Housing Partnership ("GCHP"), a nonprofit real estate development company whose principal focus is providing affordable housing, began redeveloping a building formerly used as a nursing home, located at 2535 Esplanade Avenue in New Orleans.  GCHP, along with other nonprofit organizations and developers, planned to convert the Esplanade property into a forty-unit affordable housing development.  Half of the proposed units would be reserved for low-income individuals, and the other half of the units would serve as "permanent supportive housing" for homeless persons with

1

mental and physical disabilities.  The Esplanade property would also include an on-site case management office, which would primarily involve assisting tenants in the transition from homelessness to independent living.  The project, however, has had a difficult history;[1] the City of New Orleans' alleged role in that history was discussed at length in this Court's previous Order and Reasons,[2] and the Louisiana State Bond Commission's alleged role is at issue in this motion.

The main source of funding for the redevelopment project was to be provided by the Piggyback Program, which was created by the State of Louisiana to assist in redevelopment efforts post-Hurricane Katrina.  Under the Piggyback Program, eligible projects would receive funds from a combination of sources, including state-issued bonds that require the approval of the

---

[1] For example, the complaint alleges significant opposition expressed by the neighbors.  The United States quotes an unsigned flier that was allegedly circulated in the neighborhood and submitted to the Board of Zoning Adjusters.  According to the complaint, the flier states that the proposed Esplanade apartments would be occupied by "the **homeless**, **ex-offenders**, people with **mental illness**, HIV/AIDS, people with a history of drug usage, and others similarly situated in a concept described as "supportive housing." . . . NO facility of this nature should be located in a residential neighborhood, particularly an Historic Residential Neighborhood!!!!!" (emphasis in original).  The United States' complaint also cites a letter opposing the project, written by the president of the Esplanade Ridge & Treme Civic Organization, which states that "[t]hese are people who really need more intensive care.  In truth, they should be in an institutional setting."

[2] See Rec. Doc. 25.

Louisiana State Bond Commission.  In August 2009, the Bond Commission adopted a moratorium on approving bond financing under the Piggyback Program for low-income housing projects, stating that it needed to study the housing marking in New Orleans.  At the time, the United States alleges that the Bond Commission knew that Esplanade and two other affordable housing projects in New Orleans would be affected by the moratorium; however, the two other projects, neither of which provide housing for persons with disabilities, were granted funding as "exceptions" to the moratorium.

Specifically, on August 4, 2010, the Mayor of New Orleans wrote to the Chairman of the Bond Commission to request that a seventy-unit affordable housing project for seniors, known as the Oretha Castle Haley development, be placed on the August 2010 Bond Commission agenda and approved for funding.  The Bond Commission subsequently placed this project on its August 2010 agenda and approved its financing.  Similarly, on August 17, 2011, the Mayor wrote to the Chairman in support of bond financing of the B.W. Cooper mixed-income housing development. Again, the Bond Commission placed the B.W. Cooper project on the August 2011 agenda and approved its financing.  In light of these two "exceptions" to the moratorium, the Esplanade developers, on numerous occasions, asked the Mayor to similarly request that the Esplanade project be included on the Commission's agenda.  The

Mayor refused such requests without explanation.  The developers also directly requested the Bond Commission to place the Esplanade project on the Commission's agenda, and, on each occasion, the Bond Commission declined to do so with no explanation.  In April 2010, a state senator, serving in a representative capacity on the Bond Commission, wrote to the City Planning Commission and stated that he was "very familiar with the proposed use" of the Esplanade project and "strongly urge[d]" its denial.  The letter further stated that the project would "be occupied by recovering drug addicts, the perennially homeless, and former convicts, with no direct supervision and unlimited ingress and egress, . . . . [and] would constitute a death sentence for the surrounding" neighborhood.

A final study on the low-income housing needs was released in March 2011, which concluded that the New Orleans' housing market would support additional low-income affordable housing. The moratorium, however, has yet to be lifted (despite the fact that the housing study was the given reason for imposing the moratorium).  To date, the Esplanade project has not received Piggyback funding.

The United States Department of Justice filed suit in this Court on August 6, 2012, alleging that the City of New Orleans and the Louisiana State Bond Commission violated the Fair Housing Act and Title II of the American with Disabilities Act.  The

4

United States seeks injunctive relief to stop the City and the
Bond Commission from continuing to obstruct the Esplanade
project, and retrospective relief for the damages incurred by the
developers due to the City and Bond Commission's delays.  On
September 28, 2012, the City moved for dismissal of the claims
under Federal Rules 12(b)(1) and 12(b)(6), asserting that the
Court lacks subject matter jurisdiction, and that the United
States fails to state a claim upon which relief can be granted;
the motion only requested dismissal as to claims asserted against
the City.  The Court denied this motion on December 6, 2012.  The
Bond Commission now moves to dismiss the United States' claims
under Rule 12(b)(6).


I. <u>Legal Standard</u>

Rule 12(b)(6) of the Federal Rules of Civil Procedure allows
a party to move for dismissal of a complaint for failure to state
a claim upon which relief can be granted.  Such a motion is
rarely granted because it is viewed with disfavor.  <u>See</u> <u>Lowrey v.</u>
<u>Tex. A & M Univ. Sys.</u>, 117 F.3d 242, 247 (5th Cir. 1997) (quoting
<u>Kaiser Aluminum & Chem. Sales, Inc. v. Avondale Shipyards, Inc.</u>,
677 F.2d 1045, 1050 (5th Cir. 1982)).  In considering a Rule
12(b)(6) motion, the Court "accepts 'all well-pleaded facts as
true, viewing them in the light most favorable to the
plaintiff.'"  <u>See</u> <u>Martin K. Eby Constr. Co. v. Dall. Area Rapid</u>

Transit, 369 F.3d 464 (5th Cir. 2004) (quoting Jones v. Greninger, 188 F.3d 322, 324 (5th Cir. 1999)).   But, in deciding whether dismissal is warranted, the Court will not accept conclusory allegations in the complaint as true.  Kaiser, 677 F.2d at 1050. Indeed, the Court must first identify allegations that are conclusory and, thus, not entitled to the assumption of truth.  Ashcroft v. Iqbal, 556 U.S. 662, 678-79 (2009).  A corollary: legal conclusions "must be supported by factual allegations." Id. at 678.  Assuming the veracity of the well-pleaded factual allegations, the Court must then determine "whether they plausibly give rise to an entitlement to relief." Id. at 679.

    "'To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" Gonzalez v. Kay, 577 F.3d 600, 603 (5th Cir. 2009)(quoting Iqbal, 556 U.S. at 678)(internal quotation marks omitted).  "Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)."  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (citations and footnote omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S.

at 678 ("The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."). This is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Id. at 679. "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." Id. at 678 (internal quotations omitted) (citing Twombly, 550 U.S. at 557). "[A] plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief'", thus, "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Twombly, 550 U.S. at 555 (alteration in original) (citation omitted).

In deciding a motion to dismiss, the Court may consider documents that are essentially "part of the pleadings." That is, any documents attached to or incorporated in the plaintiff's complaint that are central to the plaintiff's claim for relief. Causey v. Sewell Cadillac-Chevrolet, Inc., 394 F.3d 285, 288 (5th Cir. 2004) (citing Collins v. Morgan Stanley Dean Witter, 224 F.3d 496, 498-99 (5th Cir. 2000)). Also, the Court is permitted to consider matters of public record and other matters subject to judicial notice without converting a motion to dismiss into one for summary judgment. See United States ex rel. Willard v.

7

Humana Health Plan of Tex. Inc., 336 F.3d 375, 379 (5th Cir. 2003).

## II.   Discussion

The Louisiana State Bond Commission contends that the United States' complaint lacks well-pleaded factual allegations sufficient to give rise to a cause of action and, therefore, dismissal under Rule 12(b)(6) is appropriate. The Court does not agree.

### A.

As a threshold matter, the Court notes that this motion is simply untimely. The United States served its amended complaint on the Bond Commission on December 26, 2012, and the Bond Commission's answer was due January 16, 2013.[3]   See Fed. R. Civ. P. 12(a)(1). A motion to dismiss under Rule 12(b)(6) must be made before the time for filing an answer, or, in this case, before January 16, 2013. See Fed. R. Civ. P. 12(b). The Bond Commission, however, filed this motion and its answer, almost two months late, on March 22, 2013. Notably, the Bond Commission never sought an extension of time in which to file a responsive

---

[3] The United States asserts that the Bond Commission's answer was due on February 25, 2013; however, the record contains no indication that defendant timely waived service under Rule 4(d) to avail itself of the sixty-day time frame. Further, the record explicitly states that the Commission's answer was due on January 16, 2013. See Rec. Doc. 30, 31. Even assuming the deadline was February 25, 2013, this motion would nevertheless be untimely because it was filed on March 22, 2013.

pleading.[4]  The United States, however, never challenged the Bond
Commission's failure to answer before now, and focuses the
majority of its opposition memorandum on the substance of this
motion.[5]  The Court will therefore treat this untimely Rule
12(b)(6) motion as a motion for judgment on the pleadings under
Rule 12(c), which is well within the Court's discretion.  See Doe
v. MySpace, Inc., 528 F.3d 413, 418 (5th Cir. 2008) ("A motion
for judgment on the pleadings under Rule 12(c) is subject to the
same standard as a motion to dismiss under Rule 12(b)(6).");
Jones v. Greninger, 188 F.3d 322, 324 (5th Cir. 1999) (noting
that a district court may treat an untimely Rule 12(b)(6) motion
as a Rule 12(c) motion).

*B.*

     The Bond Commission urges that the United States has failed
to state a claim for any violation under the Federal Housing Act
or the American with Disabilities Act because "[t]here are no
facts alleging culpable conduct on the part of the Bond
Commission."  To the contrary, the Court finds that the United

_____

[4] The Court notes that Local Rule 7.8 requires the Court, upon
request, to grant a twenty-one day extension of time to plead, if
the moving party has not previously obtained an extension of time
(as is the case here with the Bond Commission) and the opposing
party has not objected (the United States indicates that it
requested that the Commission answer or seek an extension of
time, indicating that the United States would likely not object
to such an extension).

[5] The only reference to the Bond Commission's untimely response
is in a footnote.

States has sufficiently pleaded factual allegations to state a claim of discrimination in violation of the FHA and ADA, under both the disparate treatment and disparate impact framework.[6] Specifically, the United States alleges that the Bond Commission discriminated by (1) adopting a moratorium on all affordable housing in Orleans Parish funded through the Piggyback Program; (2) creating exceptions to the moratorium for similarly situated housing projects that did not target prospective tenants with disabilities or involve community opposition; (3) refusing to lift the moratorium after the housing study was released; and (4) refusing the Esplanade developers' multiple requests to be placed on the Commission's agenda for funding.

Under the FHA, it is unlawful to "discriminate in the sale or rental, or to otherwise make unavailable or deny, a dwelling to any buyer or renter because of a handicap of . . . a person residing in or intending to reside in that dwelling after it is . . . made available . . . or any person associated with that buyer or renter."  42 U.S.C. § 3604(f)(1).  Similarly, Title II of the ADA generously mandates that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subject to discrimination by such entity."  42 U.S.C. § 12132.  Both federal

---

[6] The Court express no opinion on the merits of the claims.

10

statutes apply to governmental zoning and funding decisions.  <u>See</u>
<u>Greater New Orleans Fair Hous. Action Ctr. v. St. Bernard Parish</u>,
648 F. Supp. 2d 805, 808 (E.D. La. 2009); <u>see</u> <u>also</u> <u>Tsombanidis v.</u>
<u>W. Haven Fire Dept.</u>, 352 F.3d 565, 573-74 (2d Cir. 2003);
<u>Oconomowoc Residential Programs v. City of Milwaukee</u>, 300 F.3d
782-83 (7th Cir. 2002).

    A violation of the FHA and ADA can be established under the
disparate treatment or disparate impact framework.[7]  <u>See, e.g.</u>,
<u>Artisan/Am. Corp. v. City of Alvin</u>, 588 F.3d 291, 295 (5th Cir.
2009) ("We have recognized that a claim brought under the [FHA]
may be established not only by proof of discriminatory intent,
but also by proof of a significant discriminatory effect."
(internal quotation marks omitted)); <u>Tsombanidis</u>, 352 F.3d at 573
("To establish discrimination under either the FHA or the ADA,
plaintiffs have three available theories:  (1) intentional
discrimination (disparate treatment); (2) disparate impact; and
(3) failure to make a reasonable accommodation."); 24 C.F.R. §
100.500 ("Liability may be established under the [FHA] based on a
practice's discriminatory effect, . . . even if the practice was
not motivated by a discriminatory intent."); 28 C.F.R. §
35.130(b)(3) ("A public entity may not . . . utilize criteria or
methods of administration . . . that have the effect of

_____

[7]  Case literature often interchangeably uses the term
"intentional discrimination" for disparate treatment and
"discriminatory effect" for disparate impact.

subjecting qualified individuals with disabilities to discrimination on the basis of that disability . . . .").

It is important to note for Rule 12(b)(6) purposes, the United States need not plead a prima facie case to state a plausible claim of discrimination. <u>See, e.g.</u>, <u>Flores v. Select Energy Servs., L.L.C.</u>, No. 11-11024, 2012 WL 3530911, at *2 (5th Cir. Aug. 16, 2012) (citing <u>Swierkiewicz v. Sorema N.A.</u>, 534 U.S. 506, 510 (2002)).

*C.*

To prove disparate treatment under both the FHA and ADA, the plaintiff must show that the defendant intended to discriminate or was improperly motivated in making the discriminatory decision.[1]  <u>See, e.g.</u>, <u>Hanson v. Veterans Admin.</u>, 800 F.2d 1381, 1386 (5th Cir. 1986); <u>Greater New Orleans Fair Hous. Action Ctr.</u>, 648 F. Supp. 2d at 808.  The Bond Commission contends that "only direct culpable conduct on the part of the Bond Commission itself would be sufficient to impose liability."  The Bond Commission is

---

[1] The statutes are often interpreted in tandem.  In addition, as the Court expressed in its December 6, 2012 Order and Reasons, the mixed-motive framework is still available for claims under antidiscrimination statutes within the Fifth Circuit, with the exception of the Age Discrimination in Employment Act.  <u>See</u> <u>Smith v. Xerox</u>, 602 F.3d 320 (5th Cir. 2010) (limiting the application of <u>Gross v. FBL Fin. Servs., Inc.</u> to claims under the ADEA only).
  In addition, the Court notes that the Bond Commission is not challenging whether the prospective tenants of the Esplanade project are "disabled" within the terms of both statutes, because addiction and mental illness are considered disabilities under the law.  <u>See</u> 24 C.F.R. § 100.201(a)(1); 28 C.F.R. § 41.31(b)(1)(ii).

misguided; direct evidence is not needed.  FHA cases have adopted

the same standard for proving discriminatory intent that governs

an equal protection claim as articulated by the U.S. Supreme

Court in Village of Arlington Heights v. Metropolitan Housing

Development Corp., 429 U.S. 252 (1977).  To assess whether or not

discriminatory intent exists, the Fifth Circuit, faithful to

Arlington Heights, has held the following circumstantial factors

to be both pertinent and non-exhaustive:

    1. historical background of the decision;

    2. the specific sequence of events leading up to the
    decision;

    3. departures from the normal procedural sequence;

    4. substantive departures; and

    5. legislative history, especially where there are
    contemporary statements by members of the decision-making
    body.

Overton v. City of Austin, 871 F.2d 529, 540 (5th Cir. 1989); see

also Greater New Orleans Fair Hous. Action Ctr., 648 F. Supp. 2d

at 808.  Application of the Arlington Heights factors

demonstrates that the discrimination claims of the federal

government in this case are plausible on their face.

    Under the first and second Arlington Heights factors, which

examine the historical background and the specific sequence of

events, the United States alleges that the Bond Commission's

actions occurred in response to community opposition to the

Esplanade project.  For example, a state senator, serving on the

Bond Commission, acknowledged this opposition in a letter to the Director of the City Planning Commission by stating he was "very familiar with the proposed use" of the Esplanade project and "strongly urge[d] its denial" because it would "constitute a death sentence for the surrounding" neighborhood.  See Greater New Orleans Fair Hous. Action Ctr., 648 F. Supp. 2d at 811-12 ("[T]he public statements are relevant both as expressing the general sentiment during the decision making process and also insofar as public opinion was specifically referenced by the decision-makers themselves."); see also Tsombanidis, 352 F.3d at 850 ("[T]he history of hostility of neighborhood residents . . . and their pressure on the Mayor and other city officials . . . supports the [district] court's finding that this hostility motivated the City in initiating and continuing its enforcement efforts.").  In addition, the historical background illustrates that the Esplanade developers have repeatedly asked to be placed on the Commission's agenda for funding approval.  On every occasion, the developers were denied their request without any explanation, while, simultaneously, the Bond Commission placed similar projects on its agenda (which it then funded).  The Bond Commission contends that because "no explanation of the denial was given, this fact cannot be sufficient to state a cause of action against the Bond Commission because the Court would have to engage in impermissible speculation as to the reason or basis

14

for denial." The Bond Commission appears confused as to the legal standard for a Rule 12(b)(6): all factual allegations (not just this one) must be considered as a whole in deciding whether a complaint states a plausible claim on its face. Moreover, a failure to explain an action may be circumstantial evidence of intent, especially when the Commission approved other similar projects.[2]

The third and fourth <u>Arlington Heights</u> factors address procedural and substantive departures. The United States alleges that the Bond Commission failed to apply the moratorium consistently, creating "exceptions" for similarly situated housing projects that did not involve prospective tenants with disabilities or vocal community opposition. Further, the Commission has refused to lift the moratorium despite the fact its intended purpose—to study the low-income housing situation in New Orleans—was completed in March 2011; the results of the study determined that there was a need for additional affordable housing. The Bond Commission argues that the moratorium cannot serve as a basis for liability because any discriminatory implication is "negated" by the fact the Commission has granted exceptions. This argument is wholly without merit: selective

---

[2] In fact, once a plaintiff proves a prima facie case of discrimination, the law shifts the burden to the defendant to articulate a legitimate, nondiscriminatory reason for the challenged action. <u>See</u> <u>Grimes v. Texas Dep't of Mental Health & Mental Retardation</u>, 102 F.3d 137, 140 (5th Cir. 1996).

15

enforcement of the moratorium is precisely the kind of allegation that plausibly infers discrimination.  <u>See, e.g.</u>, <u>Coleman v. Donahoe</u>, 667 F.3d 835, 857 (7th Cir. 2012) ("Such evidence of selective enforcement of a rule calls into question the veracity of the employer's explanation. (internal quotation marks omitted)); <u>Williams v. City of Valdosta</u>, 689 F.2d 964, 975 (11th Cir. 1982) ("The City's formal promotional policy was inconsistent [and t]his inconsistency supports the conclusion that . . . [the] requirement was a pretext . . . for unfavorable treatment.").

Last, the fifth <u>Arlington Heights</u> factor takes into account legislative history, in particular statements made by members of the decision-making body.  As previously mentioned, the amended complaint, alleges that a member of the Bond Commission stated that the Esplanade project would "be occupied by recovering drug addicts, the perennially homeless, and former convicts, with no direct supervision and unlimited ingress and egress, . . . [and] would constitute a death sentence for the surrounding" neighborhood.

As a result, the Court finds that the complaint contains sufficient factual allegations to state a discrimination claim, under the disparate treatment framework, in violation of the FHA and ADA.

*D.*

In addition to prohibiting actions taken with a discriminatory intent, the FHA and ADA also prohibit actions that have a discriminatory impact.  See <u>Simms v. First Gibraltar Bank</u>, 83 F.3d 1546, 1555 (5th Cir. 1996) ("A violation of the FHA may be established not only by proof of discriminatory intent, but also by a showing of significant discriminatory effect."); <u>see also</u> <u>Req'l Econ. Cmty. Action Program v. City of Middletown</u>, 294 F.3d 35, 52 (2d Cir. 2002) ("The FHA and the ADA provide relief not only from polices adopted and actions taken with a discriminatory intent, but also from the application of facially neutral standards that have an unlawful discriminatory effect upon a protected class.").

To prove a disparate impact discrimination claim, the plaintiff must show the existence of a facially neutral policy or practice that "actually or predictably results in a disparate impact on a group of persons or creates, increases, reinforces, or perpetuates segregated housing patterns because of [disability]."  24 C.F.R. § 100.500(a); <u>see</u> <u>also</u> 28 C.F.R. § 35.130(b)(3) (corresponding ADA provision).  The Fifth Circuit has emphasized that the question is "whether a policy, procedure, or practice specifically identified by the plaintiff has a significantly greater discriminatory impact on members of a

protected class." <u>Simms</u>, 83 F.3d at 1555; <u>see also</u> <u>Tsombanidis</u>, 352 F.3d at 574-75.

The Court finds that the United States has pleaded sufficient factual allegations to state a plausible claim of disparate impact.[3]  The amended complaint identifies a facially neutral policy, namely, the moratorium.  Moratoriums and other zoning practices are actionable under the FHA and ADA when they have a discriminatory effect on a protected class.  <u>See</u> <u>Greater New Orleans Fair Hous. Ctr.</u>, 641 F. Supp. 2d at 577-78 (noting that a moratorium passed in 2008 on construction of multi-family housing had a discriminatory effect on African-Americans); 24 C.F.R. § 100.70(d)(5) (articulating prohibited housing practices, which include enacting or implementing land-use rules, ordinances, policies, or procedures that restrict or deny housing opportunities or otherwise make unavailable or deny dwellings to persons because of disability); <u>see also</u> <u>Huntington Branch NAACP v. Town of Huntington</u>, 844 F.2d 926, 937-38 (2d Cir. 1988) (involving a zoning ordinance that restricted location of multi-family housing to "urban renewal area").

The United States submits that the moratorium actually or predictably results in a disparate impact, because it has a significantly greater effect on low-income persons with disabilities, factual allegations that the Court accepts as true

_____
[3] Again, the Court expresses no opinion as to the merits of this claim.

for purposes of this Rule 12(b)(6) motion.  The complaint alleges that approximately 55% of the local homeless population is disabled, with more than 2,000 disabled persons on a waiting list for permanent supportive housing, which the Esplanade project dedicates half of its units toward.  Further, the Bond Commission's selective enforcement of the moratorium, it is urged, increases its impact on persons with disabilities.

The Court finds that the United States' amended complaint contains sufficient factual matter, on the present record, that states a claim for relief that is plausible on its face.

Accordingly, IT IS HEREBY ORDERED that the Louisiana State Bond Commission's motion to dismiss is DENIED.

New Orleans, Louisiana, April 24, 2013

MARTIN L. C. FELDMAN

UNITED STATES DISTRICT JUDGE